IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF MISSISSIPPI
OXFORD DIVISION

**JOHN C. RODRIGUEZ**                                                                                              **PLAINTIFF**

**v.**                                         **No. 3:20CV32-NBB-RP**

**CALIFORNIA DEPARTMENT OF CORRECTIONS**
**DR. THOMAS**                                                                 **DEFENDANTS**

**MEMORANDUM OPINION**

      This matter comes before the court on the *pro se* prisoner complaint of John C. Rodriguez, who challenges the conditions of his confinement under 42 U.S.C. § 1983. For the purposes of the Prison Litigation Reform Act, the court notes that the plaintiff was incarcerated when he filed this suit. The plaintiff has brought the instant case under 42 U.S.C. § 1983, which provides a federal cause of action against "[e]very person" who under color of state authority causes the "deprivation of any rights, privileges, or immunities secured by the Constitution and laws." 42 U.S.C. § 1983. The plaintiff alleges that defendant Dr. Thomas provided inadequate medical care in violation of the Eighth Amendment prohibition against cruel and unusual punishment. Defendant Dr. Thomas has moved for summary judgment; the plaintiff has not responded, and the deadline to do so has expired. The matter is ripe for resolution. For the reasons set forth below, the motion by the defendant for summary judgment will be granted; the instant case will be dismissed with prejudice as frivolous, and, in the alternative, for failure to exhaust administrative remedies.

**Summary Judgment Standard**

      Summary judgment is appropriate if the "materials in the record, including depositions, documents, electronically stored information, affidavits or declarations, stipulations (including those made for purposes of the motion only), admissions, interrogatory answers, or other materials" show

that "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." FED. R. CIV. P. 56(a) and (c)(1). "The moving party must show that if the evidentiary material of record were reduced to admissible evidence in court, it would be insufficient to permit the nonmoving party to carry its burden." *Beck v. Texas State Bd. of Dental Examiners*, 204 F.3d 629, 633 (5th Cir. 2000) (citing *Celotex Corp. v. Catrett*, 477 U.S. 317 (1986), *cert. denied*, 484 U.S. 1066 (1988)). After a proper motion for summary judgment is made, the burden shifts to the non-movant to set forth specific facts showing that there is a genuine issue for trial. *Anderson v. Liberty Lobby,* Inc., 477 U.S. 242, 249, 106 S. Ct. 2505, 2511, 91 L. Ed. 2d 202 (1986); *Beck*, 204 F.3d at 633; *Allen v. Rapides Parish School Bd.*, 204 F.3d 619, 621 (5th Cir. 2000); *Ragas v. Tennessee Gas Pipeline Company*, 136 F.3d 455, 458 (5th Cir. 1998).

Substantive law determines what is material. *Anderson*, 477 U.S. at 249. "Only disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment. Factual disputes that are irrelevant or unnecessary will not be counted." *Id.*, at 248. If the non-movant sets forth specific facts in support of allegations essential to his claim, a genuine issue is presented. *Celotex*, 477 U.S. at 327. "Where the record, taken as a whole, could not lead a rational trier of fact to find for the non-moving party, there is no genuine issue for trial." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587, 89 L. Ed. 2d 538 (1986); *Federal Savings and Loan, Inc. v. Krajl*, 968 F.2d 500, 503 (5th Cir. 1992).

The facts are reviewed drawing all reasonable inferences in favor of the non-moving party. *Allen*, 204 F.3d at 621; *PYCA Industries, Inc. v. Harrison County Waste Water Management Dist.*, 177 F.3d 351, 161 (5th Cir. 1999); *Banc One Capital Partners Corp. v. Kneipper*, 67 F.3d 1187, 1198 (5th Cir. 1995). However, this is so only when there is "an actual controversy, that is, when both parties have submitted evidence of contradictory facts." *Little v. Liquid Air Corp.*, 37 F.3d 1069, 1075

(5th Cir. 1994); *see Edwards v. Your Credit, Inc.*, 148 F.3d 427, 432 (5th Cir. 1998). In the absence of proof, the court does not "assume that the nonmoving party could or would prove the necessary facts." *Little*, 37 F.3d at 1075 (emphasis omitted).

The very purpose of summary judgment is to "pierce the pleadings and assess the proof in order to see whether there is a genuine issue for trial." Advisory Committee Note to the 1963 Amendments to Rule 56. Indeed, "[t]he amendment is not intended to derogate from the solemnity of the pleadings. Rather, it recognizes that despite the best efforts of counsel to make his pleadings accurate, they may be overwhelmingly contradicted by the proof available to his adversary." *Id*. The non-moving party (the plaintiff in this case), must come forward with proof to support each element of his claim. The plaintiff cannot meet this burden with "some metaphysical doubt as to the material facts," *Matsushita*, 475 U.S. at 586, 106 S.Ct. at 1356, "conclusory allegations," *Lujan v. National Wildlife Federation*, 497 U.S. 871, 871-73, 110 S.Ct. 3177, 3180 (1990), "unsubstantiated assertions," *Hopper v. Frank*, 16 F.3d 92 (5th Cir. 1994), or by a mere "scintilla" of evidence, *Davis v. Chevron U.S.A., Inc.*, 14 F.3d 1082 (5th Cir. 1994). It would undermine the purposes of summary judgment if a party could defeat such a motion simply by "replac[ing] conclusory allegations of the complaint or answer with conclusory allegations of an affidavit." *See Lujan*, 497 U.S. at 888.

**Factual Allegations**

John C. Rodriguez is an inmate incarcerated by the California Department of Corrections and Rehabilitation ("CDCR") and was formerly housed at the Tallahatchie County Correctional Facility ("TCCF") in Tutwiler, Mississippi. *See* Compl. (Doc. No. 1) at 1. Rodriguez filed this lawsuit under 42 U.S.C. § 1983 ("§ 1983") in November 2019, alleging that – while housed at TCCF – the facility's primary care physician, Defendant Dr. Thomas, violated his civil rights in the course of treating him

for congestive heart failure. *See* Compl. (Doc. No. 1) at 1-3. Rodriguez alleges that Dr. Thomas "hi[d] the truth about how close to death [Rodriguez] was, from [him], as well as [from his] family." *Id.* at 2.[1] Rodriguez claims he was "left [at TCCF] in heart failure" after "running fever for weeks … slowly d[ying]," and claims that Dr. Thomas "knew [he] was in congestive heart failure but, for whatever reason, chose not to notify [him] or [his] family." *Id.* at 3. Rodriguez says Dr. Thomas kept him in medical isolation "for months," until an unidentified officer noticed that he was vomiting blood – which occurred, according to Rodriguez, "due to Dr. Thomas['s] failure to treat [his] condition (medical negligence)." *Id.* He claims he had no access to a phone while in medical isolation but states that medical staff at TCCF (including Dr. Thomas) stated to him that they had communicated on his behalf with the CDCR "on numerous occasions" by phone. *Id.* at 4.

Rodriguez further claims that a "Dr. Carter" from Merit Health Northwest Mississippi Hospital conducted tests that "clearly show that [he] was in heart failure," but "nothing would be done for 10 to 12 weeks after the results of these [tests] were received by Dr. Carter." *Id.* Dr. Carter is not a defendant in this lawsuit.

Regarding the administrative grievance process, Rodriguez states that he has exhausted available remedies because he has filed "at least three (3) 602's directly related to [his] medical care." *Id.* at 6. A "602" is the *CDCR's* inmate/detainee grievance form (not the grievance form used by TCCF). *See* Calif. Dep't of Corr. & Rehab. Department Operations Manual Art. 53 § 54100.1 *et seq.*

---

[1] Rodriguez also claims the CDCR failed to honor his "Adverse Emergency Medical Transfer" to transfer him from TCCF back to California for medical reasons. *Id.* at 3. He initially named the CDCR as a party defendant when he filed this case in the U.S. District Court for the Southern District of California; however, that court dismissed the CDCR during a *Spears* screening under 28 U.S.C. § 1915 – and transferred the case to this court to proceed against Dr. Thomas only. *See* Doc. No. 6; Doc. No. 12 at 1-2.

(referencing CDCR Form 602 as the Inmate/Parolee Appeal form), *available at*

ttps://www.cdcr.ca.gov/regulations/ cdcrregulations/dom-toc/ (last accessed Aug. 31, 2022).[2]

### Facts from Rodriguez's Medical Records[3]

As will become apparent from the discussion below, the plaintiff received a great deal of medical care during his stay at TCCF, though he refused medical care on multiple occasions. Indeed, he has received an extraordinary amount of medical care throughout his incarceration. CDCR produced over 538 megabytes of documents – amounting to approximately 270,000 pages – of Rodriguez's medical and institutional records from various facilities within the CDCR system. *See* Notice of Service (Doc. No. 41). Dr. Thomas produced all of Rodriguez's CDCR medical records in discovery, as well as all of his TCCF medical records. *See* Notice of Service (Doc. No. 44). The court notes that Rodriguez's TCCF chart documents the very frequent medical care he received there. During his stay, he received medical attention in some form (monitoring, screening, evaluation, medical order/note entry, lab work, referral paperwork, minor medical/urgent care appointments, scheduled and follow-up appointments, hospitalizations, administration of oral and intravenous medications, transports to emergency room or specialist care, fulfillment of requests to provide medical records to third parties, etc.), on at least the following dates in 2017: May 24-26, May 31, June 12-13, June 19, June 23, June 28, July 3, July 5, July 7, July 11, July 14, July 18, July 20, July 25, August 2, August 8, August 22, August 24, September 5, October 17, and November 21. He also

---

[2] In the form Complaint, Rodriguez did not complete sections regarding the type of relief and/or amount of damages he seeks in this action. *Id.* at 7 (showing blanks where plaintiff was given the opportunity, but declined, to state his request(s) for an injunction, damages, punitive damages, or other relief). Viewing the complaint as a whole, the court construes the request as a general prayer for relief.

[3] The court has taken the recitation of facts in the instant opinion largely from the facts in the defendant's memorandum in support of her motion for summary judgment. The facts are well-documented and undisputed.

received care on the following dates in 2018: January 15, February 15-28, March 1-2, March 5, March 8, March 12, March 16-31, April 1-2, April 9-12, April 17-18, April 20, April 24-30, May 1-3, May 5, May 8-31, and June 1-22. *See generally* Collective Ex. 1 to Faulkner Dec. (Motion Ex. A). On some of these dates, he had multiple visits with multiple medical providers. Certainly, Mr. Rodriguez can hardly complain regarding the *quantity* of care he received.

He was housed at TCCF and was under the care of Dr. Thomas at the TCCF medical clinic, among several other medical providers. *See* Declaration of TCCF Health Services Administrator James Faulkner, R.N. ("Faulkner Dec."), *attached as* Motion Ex. A, at ¶ 4.[4] While housed for 14 months at TCCF between May 2017 and June 2018, Rodriguez received on-site and off-site care on over 120 dates. *Id.* at ¶ 4; *see also generally* Collective Ex. 1 *to* Faulkner Dec. (Motion Ex. A). This is an average of 1 medical encounter every 3-4 days. He received general medical care, as well as dental care and mental health care. *See* Faulkner Dec. (Motion Ex. A) at ¶ 5; *see also generally id.* at Collective Ex. 1.

Not only did TCCF provide Rodriguez with regular in-house medical attention, TCCF also transported him to external facilities, including the Greenwood-Leflore Hospital and Merit Health Hospital in Clarksdale, Miss., as well as multiple specialist providers, including a hematologist, an oncologist, and an infectious disease physician for emergency care, hospitalizations, and specialty medical care on dozens of dates between February and June 2018. *See, e.g.* Collective Ex. 1 *to* Faulkner Dec. (Motion Ex. A) at 72-85, 118-36, 166-74, 245-49, 257-58, 268-69, 289-304, 355-64, 413-21, 429-32, 438-51, 463-71, 743-53, 954, 1145-62. This included (but was not limited to) a hospitalization in February 2018 for renal infarction, another hospitalization in May 2018 for

---

[4] The exhibits referenced in this memorandum opinion may be found attached to the defendant's motion for summary judgment.

pneumonia, and additional interim emergency room visits. *Id.* at, *e.g.*, 245-49, 290-98, 463-68, 469-71, 661-64. Between the two hospitalizations, TCCF placed Rodriguez on "sheltered housing" (also known as "extended medical monitoring") for a total of 58 days,[5] during which TCCF provided him with near-around-the-clock medical observation. *See e.g.*, *id.* at 17, 23, 24, 27, 28, 31, 33, *etc.*

Throughout his incarceration at TCCF, Dr. Thomas and other facility providers ordered and administered x-rays, scans, screenings, blood tests, anticoagulant therapies, and other types of tests and treatments to him. *Id., e.g.* at 246-47 (chest x-ray and CT scan), 305-10 (left hip x-ray), 312-31 (blood culture), 425-28 (blood culture), 452-58 (anticoagulant therapy), 478-79 (fibro scan), 696-702 (initial health screening), 754-63 (CT scan). The TCCF clinic placed necessary medical orders, such as one allowing Rodriguez to enjoy a gluten-free diet. *Id.* at 406-12, 466.

TCCF providers (including but not limited to Dr. Thomas) also administered medication to Rodriguez, including intravenous medications. *Id.* at 1080-81 (referencing picc line and IV antibiotics administered during medical monitoring). TCCF dispensed prescription and over-the-counter oral medications to Rodriguez multiple times per month between May and July 2017, and between January and June 2018. *Id.* at 3-7.

Notably, Rodriguez *refused* medical attention or was otherwise uncooperative (sometimes combative) with medical providers on about 20 separate occasions.[6] His refusals included (but were

---

[5] These include March 20-April 2, 2018 (14 days), April 28-May 1, 2018 (4 days), May 8-12, 2018 (5 days), and May 18-June 22, 2018 (35 days).

[6] According to his medical records, Rodriguez refused treatment on at least the following occasions in 2018: June 22; June 21; June 7; June 6; June 5; June 2; May 29; May 23; May 9; May 5; April 28; April 18; March 27; March 19; January 15; and on three occasions in 2017: November 21; October 17; and July 15. *Id.* at 136-50 (refused off-site visit for cardiac stress test), 181-194 (refused tests recommended by cardiologist during specialist appointment, stating "I'm sick of this sh*t. I'm not going back to that doctor again. I know how they treat inmates. They experiment on us."), 230-35 (refused to take medication if facility did not "correct" the food he was receiving), 259-67 (threatened lawsuit over medical care and insisted he was not staying in main medical unit because he wanted to

not limited to) the refusal to take prescribed medications, including heart medications. *Id.* at 3-7. He also refused to allow medical assessments, to have his vitals taken, to sign medical consent forms to allow treatment (or refusal forms to reflect that he would not accept treatment), and otherwise refused recommended care – at times cursing the providers who sought to treat him, accusing them of malpractice, and threatening them with lawsuits. *Id.* Rodriguez also refused treatment by *external* providers, including his cardiologist, on more than one occasion. *Id.*

The gravamen of the instant case is that his heart condition went essentially untreated while he was housed at TCCF and that he and his family were not appropriately informed by TCCF providers of the gravity of his medical condition. A selection of entries from Rodriguez's medical records, however, roundly refutes these claims:

• **May 8, 2018** – Rodriguez placed under extended medical monitoring after an offsite appointment with urologist, in which the specialist recommended an infectious disease consult and follow-up blood clot testing. *Id.* at 259-72.

• **May 9, 2018** – Rodriguez continued in extended medical monitoring at TCCF following urology appointment; follow-up blood clot testing scheduled for next day per urologist orders. He threatens lawsuit based on medical negligence and insists to be removed from main medical housing. *Id.* at 259-67.

• **May 10, 2018** – Rodriguez transported to off-site appointment at Merit Health hospital; blood clot testing performed. He was moved back to housing, per his request. *Id.* at 257-58.

• **May 11, 2018** – Blood clot test results received. Rodriguez requests medical records to be sent to power of attorney / family member; he completes forms and TCCF issues records per request. *Id.* at 251-56, 930.[7]

---

go to commissary the next morning), 365-70 (refused medication, stating "F**k that, f**k that, I don't want nothing from you. They can't give me what I want so I won't give you nothing. I am refusing all medical treatment so y'all can get this picc line out my arm and I can go back to my cell."), 422, 493 (refused care and refused to sign refusal form), 713, 775-78, 787-91, 826-27, 930, 932, 983, 1019, 1026, 1060, 1066, 1098, 1220, 1226-27, 1249.

[7] Rodriguez filed and signed a "Request for Patient Access to Medical Records" form through TCCF on at least three occasions: on May 2, 2018, requesting records to be sent to a third party, Katherine Rodriguez (*id.* at 932); on May 11, 2018, requesting records to be sent to his power of attorney (*id.* at

• **May 12, 2018** – Rodriguez submits sick call request due to spitting up blood and breathing difficulties; he is transported by ambulance to local emergency room and admitted into hospital with diagnosis of pneumonia. *Id.* at 249, 642-45, 931-33.

• **May 12 through May 21, 2018** – Rodriguez hospitalized for pneumonia and other conditions. *Id.* at 238-47.

• **May 21, 2018** – Cardiologist consultation form completed; Rodriguez placed on medical watch and extended medical monitoring for bacteremia (bacteria in the bloodstream) and hypercoagulation that continues until he is referred to cardiologist. *Id.* at 181-35, 727, 809-31.

• **May 29, 2018** – Rodriguez transported to cardiologist appointment; he refuses treadmill stress test. Cardiologist orders continuation of current plan of care. Stress test rescheduled. Referral to hematologist. *Id.* at 166-74, 181-94.

• **May 29 through June 5, 2018** – Rodriguez continues on medical watch and extended medical monitoring for bacteremia and hypercoagulation. *Id.* at 136-94, 787-808.

• **June 5, 2018** – Rodriguez again refuses stress test at off-site visit. Cardiologist orders continuation of current plan of care. *Id.* at 136-50.

• **June 6, 2018** – Rodriguez requests emergency consult; he is transferred to emergency room where he is advised of risks and consequences of continued refusal to accept medical care for his heart condition. Providers order continuation of current plan of care and observation. Rodriguez returns to TCCF for extended medical monitoring for hypercoagulation and heart failure. *Id.* at 118-36, 787-91.

• **June 7, 2018** – Rodriguez requests during TCCF mental health visit to be returned to California; also requests emergency consult. He is transferred to emergency room where providers conduct CT scan and administer medications, then discharge him back to TCCF. *Id.* at 493, 745-53.

• **June 7, 2018 until transported to CDCR custody on June 22, 2018** – Rodriguez continues on medical watch and extended medical monitoring at TCCF for bacteremia, hypercoagulation, and congestive heart failure. Vitals taken every 6 hours while patient is awake. Medications administered when not refused by patient. *Id.* at 8-117, 704-78.

### Denial of Medical Treatment

In order to prevail on an Eighth Amendment claim for denial of medical care, a plaintiff must allege facts which demonstrate "deliberate indifference to the serious medical needs of prisoners [which] constitutes 'unnecessary and wanton infliction of pain' proscribed by the Eighth Amendment

---

930); and on May 21, 2018, requesting records to be send to a third party, Roxanne Rodriguez (*id.* at 827). Contrary to the plaintiff's allegations, all such requests were honored. *See* Faulkner Dec. (Motion Ex. A) at ¶ 6.

. . . whether the indifference is manifested by prison doctors or prison guards in intentionally denying or delaying access to medical care . . . ." *Estelle v. Gamble*, 429 U.S. 97, 104-105, 50 L. Ed. 2d 251, 260 (1976); *Mayweather v. Foti*, 958 F.2d 91, 91 (5th Cir. 1992). The test for establishing deliberate indifference is one of "subjective recklessness as used in the criminal law." *Farmer v. Brennan*, 511 U.S. 825, 837 (1994). Under this standard, a state actor may not be held liable under 42 U.S.C. § 1983 unless plaintiff alleges facts which, if true, would establish that the official "knows of and disregards an excessive risk to inmate health or safety; the official must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and he must also draw the inference." *Id.* at 838. Only in exceptional circumstances may a court infer knowledge of substantial risk of serious harm by its obviousness. *Id*. Negligent conduct by prison officials does not rise to the level of a constitutional violation. *Daniels v. Williams*, 474 U.S. 327, 106 S.Ct. 662 (1986), *Davidson v. Cannon*, 474 U.S. 344, 106 S.Ct. 668 (1986). A prisoner's mere disagreement with medical treatment provided by prison officials does not state a claim against the prison for violation of the Eighth Amendment by deliberate indifference to his serious medical needs. *Gibbs v. Grimmette*, 254 F.3d 545 (5th Cir.2001), *Norton v. Dimazana*, 122 F.3d 286, 292 (5th Cir. 1997).

"Deliberate indifference is not established when medical records indicate that [the plaintiff] was afforded extensive medical care by prison officials." *Brauner v. Coody*, 793 F.3d 493, 500 (5th Cir. 2015). Nor is it established by a physician not accommodating a prisoner's requests in a manner he desired or the prisoner's disagreement with the treatment. *Id.*; *Miller v. Wayback House*, 253 F. App'x 399, 401 (5th Cir. 2007). To meet his burden in establishing deliberate indifference on the part of medical staff, the plaintiff "must show that [medical staff] refused to treat him, ignored his complaints, intentionally treated him incorrectly, or engaged in

any similar conduct that would clearly evince a wanton disregard for any serious medical needs." *Brauner*, 793 F.3d at 498.

Based on the above chronology – gleaned from the undisputed (and voluminous) medical records – TCCF medical providers (including Dr. Thomas) timely responded to Rodriguez's medical needs, ensured he had onsite monitoring and off-site emergent and specialty care, provided his medical records to third parties as he requested, and stood ready to provide treatment to him for his heart condition and other ailments – even though he frequently refused to accept such treatment. There is simply no evidence that Dr. Thomas or any other TCCF medical provider was deliberately indifferent to Rodriguez's medical needs.

Put simply, no rational reading of the records in this case (summarized above) leads to the conclusion that the defendant (or any medical provider) was deliberately indifferent to Rodriguez's serious medical needs. First, to say the least, "medical records indicate that [Rodriguez] was afforded extensive medical care by prison officials." *Brauner, supra*. The plaintiff's claim would fail for this reason, alone. In addition, he cannot show that any medical staff refused to treat him, ignored his medical complaints, purposefully treated him incorrectly – or showed a wanton disregard for his serious medical needs. He received treatment for his heart condition – and related problems – literally scores of times. It appears that the only person who interfered with Rodriguez's treatment was Rodriguez, himself. Finally, his allegation that the defendant refused to inform him or his family about his condition, including its severity, may not be a valid claim under 42 U.S.C. § 1983. However, even if it were, this allegation is flatly contradicted in his medical files. In sum, on the current record, the defendant's motion for summary judgment will be granted, and the plaintiff's claims regarding denial of adequate medical care will be dismissed as frivolous.

**Conclusion**

For the reasons set forth above, on the current record, the defendant's motion for summary judgment will be granted, and the plaintiff's claims will be dismissed with prejudice as frivolous, and, in the alternative, the case will be dismissed for failure to exhaust administrative remedies.[8] A final judgment consistent with this memorandum opinion will issue today.

**SO ORDERED**, this, the 27th day of January, 2023.

/s/ Neal Biggers
**NEAL B. BIGGERS, JR.**
**UNITED STATES DISTRICT JUDGE**

---

[8] The court has discretion to dismiss a prisoner § 1983 case both on the merits, and, in the alternative, for failure to exhaust administrative remedies. *See Martinez v. Bus Driver*, 344 F. App'x 46, 49 (5th Cir. 2009) (per curiam) (upholding district court's dismissal of prisoner § 1983 case both on the merits and, alternatively, for failure to exhaust administrative remedies); *see also Gonzalez v. Prasifka*, 54 F. App'x 406 (5th Cir. 2002) (District Court "did not err in dismissing [the plaintiff's § 1983] action [on the merits and] on the alternative ground that he failed to exhaust his administrative remedies.")